**Opinion issued May 21, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-18-00214-CR**

**NO. 01-18-00215-CR**

————————————

**NIYOKA CAMPBELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1501965 & 1516914**

---

**MEMORANDUM OPINION**

Niyoka Campbell was charged with aggregate theft and attempted theft in

two separate cause numbers.[1] After a joint trial, the jury found her guilty of both

---

[1] *See* TEX. PENAL CODE §§ 31.03(a), 31.09 (aggregate theft); *see id.* § 15.01(a)
(criminal attempt).

offenses, and the trial court sentenced her in accordance with the jury's verdict. On appeal, Campbell contends that there is legally insufficient evidence to support either of her convictions and that the State improperly commented on her failure to testify during closing argument.

We affirm.

## Background

This is an embezzlement case. Viewed in the light most favorable to the verdict, the evidence shows that Campbell embezzled money from her employer, Crowley Maritime Corporation, by setting up a sham vendor account into which she deposited misappropriated funds using fraudulent invoices; that after she embezzled the money, she abruptly tendered her resignation; and that after she had officially left the company, she attempted to steal more money, using the same type of fraudulent invoices.

### Campbell embezzles money from Crowley

In 2014, Campbell was employed as an accountant at Crowley Maritime Corporation. At this time, Campbell also operated her own tax and accounting firm, Hollywood Tax & Financial Services, which she had disclosed to Crowley when she was hired.

At Crowley, Campbell's specific title was vessel accountant. As a vessel accountant, Campbell assisted the accounts payable vendor on-boarding team (the

vendor team) in setting up new vendors with Crowley. To that end, Campbell would scan and email the vendor team W-9 forms, which provided tax identification information for new Crowley vendors. She would also provide the vendor team with ACH forms,[2] which contained bank account information for those vendors requesting to be paid electronically.

On November 24, 2014, Campbell asked her co-worker, William Wagan, to email a W-9 form to the vendor team for her, explaining to him that she was having difficulties receiving files from the company scanner. Campbell sent the W-9 form to Wagan directly from the scanner, and Wagan then emailed the W-9 to the vendor team, copying Campbell on the email. The W-9 form was for a company named Strong Roots of Texas.

The following Monday, December 1, 2014, Campbell abruptly tendered her resignation to Crowley, notifying Crowley that her last day would be that Friday, December 5, 2014.

A few weeks after Campbell's departure, Crowley's accounting manager, Gualberto Grande, was analyzing company financials when something caught his attention. Grande noticed that a project that had been completed in February 2014 had incurred approximately $160,000 in additional expenses in November and

---

[2]    ACH stands for "Automated Clearinghouse," which is an electronic payment delivery system that processes electronic credit and debit transfers.

December 2014. Because it was unusual for expenses to be reported after a project's completion, Grande contacted the two individuals marked on the invoices as approving them—the project's manager, Geoff Baker, and Crowley's vice president, Craig Tornga. Both Baker and Tornga advised Grande that they had not approved and did not otherwise recognize the invoices submitted for the expenses. They further advised Grande that the company listed on the invoices, Strong Roots, was not a vendor for this project.

Grande began searching online for information on Strong Roots and discovered that Campbell was listed as the owner. Grande continued his investigation by reviewing the activity on FileNet, the software program used by Crowley to upload and store project invoices. Because FileNet records the username of any employee logged into its secure system, Grande was able to determine that Campbell had uploaded the fraudulent invoices. Campbell's username was recorded as having uploaded four invoices from Strong Roots in the amounts of $39,698.17, $37,962.01, $28,816.86 and $53,341.31.

After determining that Campbell had uploaded the invoices to FileNet, Grande examined each individual invoice. In FileNet, when the curser is placed over a note that has been made electronically on an invoice, a yellow pop-up window appears with additional details associated with that note. But when Grande placed the computer curser over Baker's and Tornga's approvals, no yellow pop-

4

up appeared. Because this feature was missing on the approval marks on all four invoices, Grande determined that the approval stamps had not been made within FileNet but instead had been fraudulently placed on the invoices before they were uploaded.

Grande knew that Campbell's former position in Crowley's accounting department not only provided her access to FileNet but gave her the ability to upload invoices onto the program. Campbell also had access to prior invoices approved by Baker and Tornga, which meant that she also had access to Baker and Tornga's approval stamp images and the opportunity to copy and paste them onto fraudulently-created invoices. FileNet recorded Campbell uploading the first three invoices on November 25, 2014 and the fourth invoice on December 4, 2014—the day before her last day at Crowley.

Having determined that Campbell owned Strong Roots, set up Strong Roots as a vendor with Crowley, and then uploaded four fraudulent Strong Roots' invoices onto FileNet, Grande forwarded his investigation to Crowley's internal auditors.

Crowley's director of internal audit, Melvin Dodson, took over the investigation. Dodson's investigation sought to answer three questions: (1) How did Strong Roots get set up as a Crowley vendor? (2) How were the Strong Roots'

invoices approved? and (3) Where did the money paid by Crowley on the invoices go?

Dodson contacted the vendor team directly and asked for all vendor set-up requests from Strong Roots. Dodson found that, in addition to the request submitted by Wagan for Campbell on November 24, 2014, Campbell herself had submitted a second email request to the vendor on-boarding team the following day, November 25, 2014. The second email request provided the same W-9 form Wagan had submitted but added an ACH form containing Strong Roots' Chase Bank account number for electronic payment. Thus, Dodson concluded that Strong Roots was set up as a vendor by Campbell.

Dodson went into FileNet to examine how the four invoices had been approved. The approvals on the invoices appeared to be the usual blue watermarks bearing Baker's and Tornga's names; however, like Grande, Dodson quickly realized that the watermarks had not been put on the invoices through the FileNet system application, as the yellow security feature did not appear when the curser was placed over the electronic signatures. Thus, Dodson concluded that the invoices had been fraudulently approved.

Dodson then turned to where the money Crowley paid on the invoices had gone. Unable to resolve the issue on his own, and increasingly confident that a crime had been committed, Dodson put together a packet of Crowley's internal

investigation and submitted it for further investigation to the Harris County District Attorney Office's Financial Crimes Division.

The DA's chief fraud examiner, Brian Vaclavik, performed a forensic examination of the bank accounts and wire transfers involved in this scheme against Crowley. Vaclavik traced the total sum paid out of Crowley's account under the fraudulent invoices, $159,818.34, to a Chase Bank account that Campbell had opened in Strong Roots' name and to which Campbell had sole access. Vaclavik found that Campbell had withdrawn money from this Chase Bank account through checks written out to cash and through purchasing cashier's checks that she subsequently deposited into her personal bank account at Shell Credit Union.

In conducting his investigation, Vaclavik first obtained the Chase Bank records for Strong Roots and verified that the account number matched the account number on the ACH form Campbell had submitted to the Crowley vendor team. Per the Chase Bank records, the title of the account was in Strong Roots' name, and Campbell was listed as the only signer, i.e., the only person with access to the account. Vaclavik also obtained bank records from Shell Credit Union for all accounts Campbell personally owned with her husband, Gregory Campbell. Vaclavik learned that Campbell opened the Chase Bank account for Strong Roots on November 24, 2014—the same day Campbell asked Wagan to submit Strong

7

Roots' W-9 form to establish Strong Roots as one of Crowley's vendors. The only three deposits made into the Chase Bank account were from Crowley paying out the fraudulent invoices. Crowley paid the four invoices with three deposits to Strong Root's Chase Bank account; the second deposit, for $66,778.87, combined payments for the two invoices reflecting $37,962.01 and $28,816.86, respectively.

In sum, the records obtained from Chase Bank and Shell Credit Union showed that:

- On November 28, 2014, Crowley paid the first fraudulent invoice, and, as a result, $39,698.17 was deposited into Strong Roots' Chase Bank account.

- On November 29, 2014, a $30,300 check, made out to be payable to cash and signed with Campbell's name, cleared Strong Roots' Chase Bank account. A $14,000 cashier's check, listing Strong Roots as the remitter and made payable to Campbell, was purchased from Chase Bank and then deposited into a Shell Credit Union line of credit account held by Campbell and her husband.

- On December 3, 2014, Crowley paid the second and third fraudulent invoices, and, as a result, $66,778.87 was deposited into Strong Roots' Chase Bank account.

- On December 4, 2014, a $34,000 check, made out to be payable to cash and signed with Campbell's name, cleared Strong Roots' Chase Bank account.

- On December 9, 2014, Crowley paid the fourth fraudulent invoice, and, as a result, $53,341.30 was deposited into Strong Roots' Chase Bank bank account.

- On December 20, 2014, a $77,873.83 check, made out to be payable to cash and signed with Campbell's name, cleared Strong Roots' Chase Bank account. A $7,000 Chase Bank cashier's check, listing Strong Roots as the remitter and made payable to Campbell, was deposited into Campbell's

8

Shell Credit Union account. After the $7,000 was deposited from the Chase Bank cashier's check into Campbell's Shell Credit Union account, $4,000 was then transferred into another one of Campbell's Shell Credit Union accounts in the name of, "Strong Roots of Texas, DBA [doing business as] Hollywood Tax Service."

Within a two-month period, over $150,000 from Crowley was deposited into, and withdrawn from, Strong Roots' Chase Bank account opened in Campbell's name.

***Campbell attempts to steal additional money from Crowley***

In March 2016—over a year after Crowley paid the fraudulent invoices and while the DA's investigation was underway—a Crowley import specialist, Mary Jones, received three emails from an alleged representative of Strong Roots named Yvonne Lima. In the emails, Lima inquired about two allegedly outstanding invoices, one for $106,695.02 and the other for $61,952.81. Jones was unable to find anyone in her department who knew about the matter, so she forwarded the emails to her accounting manager, Sandra Goranovic. Goranovic then forwarded the emails to Dodson, who was still employed as Crowley's director of internal audit.

Dodson reviewed the emails from Strong Roots and saw that both attached invoices had been marked approved by Baker and Tornga and had the same approval dates as the fraudulent invoices submitted in late 2014. The emails also had an ACH form attached, which listed a different account number than the Chase

Bank account number that had been previously provided for Strong Roots. Dodson then investigated the name listed in the signature of the emails, Yvonne Lima, but was unable to find any information regarding who she was or whether she even existed. Dodson alerted Crowley's accounts payable department that the invoices were fraudulent and should not be paid. He then contacted the Harris County DA's Office.

Tuan Pham, an investigator with the DA's Forensic Investigation Division, was assigned to investigate the Strong Roots email account requesting payment from Crowley on the two fraudulent invoices. The three emails had been sent from the same Yahoo email address on March 15, 25, and 31. Pham obtained the internet protocol (IP) address—a series of numbers and letters assigned to any device using the internet—for the email account. Records from Comcast provided the originating IP address used to set up the Strong Roots Yahoo email account. Pham also obtained records from Yahoo showing each time the Strong Roots email account had logged in. Pham then matched the name and address on the Comcast subscription information for the IP address used to set up the Strong Roots Yahoo account with Campbell's name and home address. Pham found that the Strong Roots Yahoo account, which had sent emails to Crowley on March 15, 25, and 31, was the same email and IP address that had been logged into Campbell's home address on those dates.

*Campbell is tried and convicted*

Campbell was charged with two offenses: aggregate theft for the initial embezzlement committed in 2014 and attempted theft for the attempt to steal additional money in 2016. After a joint trial, the jury found Campbell guilty of both charges. For the aggregate theft, the jury assessed punishment at three years' confinement. For the attempted theft, the jury assessed punishment at five years' confinement with a recommendation of community supervision. The trial court rendered judgment convicting Campbell of both offenses and sentencing her to three years' confinement and to five years' community supervision with the sentences running concurrently. Campbell appeals.

## Legal Sufficiency

In her first and second issues, Campbell contends that the evidence is legally insufficient to support her convictions for aggregate theft and attempted theft.

**A.    Applicable law and standard of review**

Under the Penal Code, a person commits the offense of theft if she unlawfully appropriates property with intent to deprive the owner of the property. TEX. PENAL CODE § 31.03(a). Appropriation of property is unlawful if it is without the owner's effective consent. *Id.* § 31.03(b)(1). When the amounts of stolen property are obtained pursuant to one scheme or continuing course of conduct, the conduct may be considered as one offense and the amounts may be aggregated to

determine the grade of offense. *Id.* § 31.09. A person commits the offense of criminal attempt if, with specific intent to commit an offense, she does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended. *Id.* § 15.01(a).

We review a challenge to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Brooks v. State*, 323 S.W.3d 893, 894–913 (Tex. Crim. App. 2010); *Binnion v. State*, 527 S.W.3d 536, 541 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). Under *Jackson*, evidence is insufficient when, considered in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 317–19; *Binnion*, 527 S.W.3d at 541. We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from such evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Binnion*, 527 S.W.3d at 541.

The jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to witness testimony. *Binnion*, 527 S.W.3d at 541. We defer to the factfinder to resolve any conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* We presume the factfinder resolved any conflicts in the evidence in favor of the verdict and

12

defer to that resolution so long as it is rational. *See Jackson*, 443 U.S. at 326; *Binnion*, 527 S.W.3d at 541.

**B.     Analysis**

Viewed in the light most favorable to the verdict, the evidence shows that, within a two-week period, Campbell (1) submitted a W-9 and electronic banking information to Crowley via email to set up her own company, Strong Roots, as one of Crowley's vendors; (2) submitted three fraudulent invoices, totaling over $150,000 and payable to Strong Roots, through Crowley's secure FileNet system; (3) opened a new Chase Bank account for Strong Roots for the sole purpose of receiving payments from Crowley for the fraudulent invoices; and (4) then abruptly provided Crowley with a five days' notice of her resignation.

The evidence further shows that in the ensuing months, checks payable to cash, signed with Campbell's name, were withdrawn from Strong Roots' Chase Bank account, and cashier's checks in Strong Roots' name were purchased at Chase Bank, and the dates of these various transactions coincided with deposits of thousands of dollars into Campbell's personal bank accounts at Shell Credit Union.

Finally, the evidence shows that a year after stealing over $150,000 from Crowley, Campbell attempted to steal from Crowley again by sending emails from Strong Roots, demanding payment for over another $150,000 in "past-due" fraudulent invoices. Although the emails stated that they were from "Yvonne

Lima," a jury could have reasonably found that it was Campbell who sent the emails, as the IP address of the emails traced back to Campbell's home address, the fraudulent invoices were nearly identical to the ones Campbell had originally submitted for Strong Roots, and investigators were unable to confirm who Lima was or whether she even existed.

From this evidence, a rational trier of fact could have found beyond a reasonable doubt that Campbell committed aggregate theft against Crowley in 2014. Likewise, from this evidence, a rational trier of fact could have found beyond a reasonable doubt that Campbell—using the same method of submitting fraudulently approved invoices from her company Strong Roots—committed attempted theft against Crowley in 2016.

Campbell argues that there is legally insufficient evidence to support her convictions because the State failed to present items of tangible evidence—such as fingerprints, photographs, or surveillance videos—directly linking her to the theft and attempted theft. However, Campbell fails to support her contentions with authority that such evidence was necessary to prove she committed the offenses. To the contrary, it is well-established that under Texas law an offense may be proven with circumstantial evidence. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be

14

sufficient to establish guilt." *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

Campbell urges us to consider the case in light of the worldwide "identity theft crisis." Campbell speculates that some unidentified hacker (1) used her work email to send vendor requests from her business, (2) logged into the FileNet system under her username to upload the fraudulent invoices, (3) used her identification card to open up a Chase Bank account in her name for her own business, and then (4) wrote checks made out to cash from the Chase Bank account and signed them in Campbell's name. (Campbell insists that any corresponding deposits of cash made into Campbell's personal account at Shell Credit Union were merely coincidences.) We decline Campbell's invitation to engage in such speculation. *See id.* at 363 ("[I]t is not the State's burden to exclude every conceivable alternative to a defendant's guilt.").

We hold that both of Campbell's convictions are supported by legally sufficient evidence. Therefore, we overrule Campbell's first and second issues.

## Closing Argument

In her third and fourth issues, Campbell contends that the trial court abused its discretion in overruling her objections and permitting the State to argue during the punishment phase of trial that Campbell should not receive probation because she had not taken responsibility for her actions or expressed remorse or regret for

what she had done. Campbell contends that the State's argument violated her right against self-incrimination by calling attention to her failure to testify.

## A.    Applicable law and standard of review

Under Texas criminal law, there are four permissible areas of jury argument: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) responses to opposing counsel, and (4) pleas for law enforcement. *Goff v. State*, 931 S.W.2d 537, 547–48 (Tex. Crim. App. 1996); *Burns v. State*, 122 S.W.3d 434, 439 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

The State may not comment on a defendant's failure to testify; such a comment violates the defendant's constitutional and statutory rights against self-incrimination. *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011). In determining whether the State has improperly commented on the defendant's failure to testify, we view the State's comment from the jury's standpoint and resolve any ambiguities in the language in favor of it being a permissible argument. *Id.* The test is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify. *Id.* In applying this standard, the context in which the comment was made must be analyzed to determine whether the language used was of such character. *Id.*

**B.     Analysis**

During closing argument in the punishment phase of trial, the prosecutor argued that the type of defendant that "deserve[s]" probation is a defendant who "takes responsibility" for her actions:

> But when you talk about what kind of defendant that stole that much money is going to deserve probation and be worthy of it, I mean, that's the kind of defendant that takes responsibility.

Campbell's counsel objected that the argument improperly commented on Campbell's failure to testify at trial. The trial court overruled the objection without hearing a response from the State.

The prosecutor then argued that Campbell's failure to repay the money she stole or otherwise express remorse or regret demonstrated that she had not taken responsibility for actions:

> So, the defendant never pays back one dollar of the stolen money. And that's incredibly telling right? That's the first thing that you would look at to try and see what kind of person she is. Never shows remorse or regret even though she betrayed—

Campbell's counsel again objected that the argument improperly commented on Campbell's failure to testify at trial, and the trial court again overruled the objection without hearing a response from the State.

Campbell argues that the trial court abused its discretion in overruling her objections because the prosecutor's arguments "fused together to improperly comment on [her] failure to testify at the punishment phase of her trial." According

17

to Campbell, the prosecutor's arguments focused the jury's attention on Campbell's failure to accept responsibility and lack of remorse. But, Campbell contends, such evidence could only have come from Campbell taking the stand and testifying that she was sorry for what she did and would make amends. Thus, Campbell concludes, the arguments were improper. We disagree.

The context in which the prosecutor's comments were made shows that the jury would not have necessarily and naturally taken them as comments on Campbell's failure to testify. After the jury found Campbell guilty of both offenses, the trial court immediately proceeded into the punishment phase of trial. The State called only one witness, Crowley's internal auditor, Melvin Dodson, who testified that (1) Campbell had not repaid any money back to Crowley and (2) Crowley did not believe community supervision would be an appropriate punishment for Campbell.

The State then rested, and Campbell called her sole witness, her husband, Gregory Campbell. But before Campbell's husband began to testify, the trial court called a brief recess in response to Campbell's crying from the defense table:

THE COURT: Ma'am, do you need a break?

CAMPBELL'S COUNSEL: Your Honor, could we take a few?

THE COURT: Please retire the jury to the jury room.

THE BAILIFF: All rise for the jury. (Jury leaves courtroom)

18

THE COURT: Ma'am, I understand this is a felony district court and you're found guilty of a felony offense. You need to keep your emotions in check.

CAMPBELL: I'm sorry.

CAMPBELL'S COUNSEL: Judge, we need just a second. I think it's just really hit her.

After a few minutes had passed, the jury was brought back in, and Campbell's husband offered his testimony. He asked the jury to place Campbell on probation and testified that, if Campbell were placed on probation, he would be supportive of restitution payments to Crowley.

The State then gave a short closing argument, reserving most of its time for rebuttal. Campbell's counsel then made her closing argument, in which she asked the jury to place Campbell on community supervision to "[g]ive her the opportunity to redeem herself" and "to pay restitution and make [Crowley] whole."

The State then made the remainder of its closing argument, including the arguments to which Campbell objected. As relevant here, the State argued as follows:

> So when you're considering punishment in a criminal case, you should consider two things because you're sort of punishing two things. You're punishing the person and you're punishing the crime. . . . It's not a crime of opportunity . . . This is something that the defendant planned. And you can tell that she planned it from the way it was carried out. She's opening a shell account at a bank just specifically to receive fraud funds. She is taking steps to ensure that that account isn't frozen, that the money is removed as quickly as possible so she gets to hang onto it. . . . [I]t's a theft that happened

19

over a course of multiple days where she's still going to work every day looking her supervisor, her coworkers in the eyes as she steals from their employer. . . . And when this defendant knows that no one's looking, that she's in a position of trust and responsibility, what does she do? She steals. She steals a huge sum of money in a premeditated and cold way, calculating way. . . . What you saw in the courtroom earlier, those are crocodile tears. That is [a] show that she put on for you because you have something she wants, and its freedom. Freedom from responsibility, freedom from imprisonment, freedom to continue spending any of that money if she still has it. Think about that. Is that justice? It's not. So, let's talk more about probation because probation is a great privilege. Defendant—not every defendant is entitled to probation. Probation is something for the exception, for the defendant that has done wrong, but has done something about it. So, and I'm not going to stand up here, you know, there are cases where probation is usually appropriate; so drug users, people with severe mental health problems that need that kind of supervision and regulation to help the[m] lead an ordinary productive life. Those cases are frequently appropriate for probation, and some theft cases are too. Okay? So, and I'm not going to say that just because of the amount that no defendant had stole $159,000 would be, you know, an appropriate probation candidate. I'm not going to stand up here and say that because I don't think it's true. But when you talk about what kind of defendant that stole that much money is going to deserve probation and be worthy of it, I mean, that's the kind of defendant that takes responsibility.

As discussed above, it was at this point that Campbell made her first objection. The trial court overruled Campbell's objection, and the State continued:

It's the defendant that makes a good faith attempt to pay the money back before they're held accountable for their actions by a group of strangers in a courtroom. And I'm not—you know, they probably would have all the money, but some of it hopefully they would have left over that they could pay back the company that they wrongfully took it from. Right? And that's just what you would expect from a decent person that made a mistake and tries to own up to it. That's the kind of person—that's the kind of defendant where probation is appropriate and should be granted. This is not that defendant. This is

the polar opposite, and your verdict so should reflect that. So, the defendant never pays back one dollar of the stolen money. And that's incredibly telling right? That's the first thing that you would look at to try and see what kind of person she is. Never shows remorse or regret even though she betrayed—

And it was at this point that Campbell made her second objection. As before, the trial court overruled Campbell's objection, and the State continued:

She doesn't do that until a group of strangers, you all hold her—make her take responsibility. So really the elephant in the room, the thing that you should all be thinking about right now—and I went this far without mentioning it on purpose because this should be in the forefront of every single one of your minds right now; she tried to do it again. It's unbelievable that she tried to do it again. To say that a person that successfully steals that much money and goes back for more deserves a probation is insulting, and you should not consider that request. Ladies and gentlemen, do you think she would have stopped if that second attempt was successful? . . . We want people to not steal from their employers; and the way we accomplish that, we can't go back and unring a bell. We can't even find that money. But what you can do, what you are in a unique position to do is let her know that her conduct is unacceptable, that employers in Harris County who employ the people in our community, pay them the salaries that they need to support their families for an honest work, honest living, deserve better. . . . And the way you do that is by sending this defendant to prison because probation is not enough. It is not enough. She makes out like a bandit if a probated sentence is granted. . . . Ladies and gentlemen, when you go back and you look at your verdict form, you should be looking at the first option, and you should put a number in there that's no less than 15 years in prison and 10 years for the attempted case. Thank you.

In context, the prosecutor's comments regarding Campbell's failure to take responsibility for her actions or express regret or remorse for what she had done could reasonably be construed as responses to (1) Campbell's crying after the jury

21

returned its verdict finding her guilty of both offenses, (2) Campbell's husband's testimony that he would be supportive of Campbell making restitution payments, and (3) Campbell's lawyer's request that the jury place Campbell on probation so she could make restitution payments. All of this—Campbell's crying, her husband's testimony, and her lawyer's request—might have led a jury to conclude Campbell regretted what she had done and accepted responsibility for her actions. But such a conclusion would have been at odds with Campbell's conduct in months leading up to her indictment, arrest, trial, and conviction—a time during which Campbell not only failed to repay any of the money she had stolen but tried to steal from Crowley again. Because we are to resolve any ambiguities in the language in favor of it being a permissible argument, we cannot say that the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on Campbell's failure to testify.

We overrule Campbell's third and fourth issues.

## Conclusion

We affirm the judgment of conviction.


                                        Laura Carter Higley
                                        Justice

Panel consists of Chief Justice Radack and Justices Higley and Hightower.

Do not publish.  TEX. R. APP. P. 47.2(b).